

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

MEG:JPM
F.# 2019R00706

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 28, 2020

<u>By ECF and Hand</u>

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Jahmeek Hudson
               <u>Criminal Docket No. 19-259 (BMC)</u>

Dear Judge Cogan:

      The government respectfully submits this supplemental letter concerning the sentencing of defendant Jahmeek Hudson.  The defendant was convicted, based on a plea, of one count of conspiracy to tamper with a witness, in violation of 18 U.S.C. § 1512(k), and one count of witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1), (b)(2)(A).  Specifically, the defendant admitted to seeking to prevent the victim of a shooting, "Jane Doe," from testifying in the June 2019 trial of her assailant, Shakeem Boykins, which was held in this district (Docket No. 18-CR-338 (ERK)).

      At the initial sentencing hearing in this matter on February 13, 2020, the Court requested additional briefing concerning Boykins' intent when he shot Jane Doe, which, the parties agreed, would be determinative as to the defendant's Guidelines calculation.  This letter supplements the government's initial submission with additional evidence establishing that, had Jane Doe died as a result of the shooting, Boykins' offense would have constituted second-degree murder under New York law.  For the reasons explained below, because Boykins' offense was effectively an attempted murder, the defendant's sentencing Guidelines should be calculated using U.S.S.G. § 2A2.1(a)(2).

      I.    <u>Supplemental Factual Submission</u>

      In our original sentencing submission (ECF Dkt. No. 22), the government identified transcript testimony (attached thereto as Exhibit A) of Jane Doe which established that Boykins' shooting, at point-blank range, was planned, intentional, and with the clear intent to kill Jane Doe.  Had Jane Doe perished, there is no doubt that Boykins would have been charged and convicted in New York State of second-degree murder.  That

trial would have used much of the same evidence presented in Boykins' "felon-in-possession" trial last summer. The Court can rely on that evidence to conclude, by a preponderance, that Boykins' offense constituted attempted murder.

In addition to the trial testimony previously submitted, the government is submitting to the Court, as part of this filing, the surveillance footage recorded during the shooting and used at Boykins' trial. This surveillance footage consists of ten clips, all of which were admitted at trial against Boykins. The clips are attached hereto as Exhibits C-1 to C-10[1] and are summarized as follows. The shooting itself, which occurred along Linden Boulevard, was not captured by any surveillance camera. The timestamps shown on each video were established as accurate and in Eastern Standard Time:

- Exhibit C-1: This clip shows Boykins' gang associate Marques Millerson leave from the residential building (Building #11) where both he and Boykins resided in the Pink Houses (1:02:21 p.m.). Approximately 15 seconds after Millerson leaves, Boykins leaves Building #11 on a bicycle (1:02:37 p.m.).

- Exhibit C-2: Millerson begins walking across a quad inside the Pink Houses, followed by Boykins on a bicycle (1:02:44 p.m.).

- Exhibit C-3: Boykins arrives on his bicycle (1:03:23 p.m.) in front of Building #5 in the Pink Houses. This is the location closest to the shooting and the building where the firearm used in the shooting was stored. Millerson arrives on foot after Boykins (1:03:37 p.m.). Also seen on the video footage (seated on a bench wearing black) is James Esquillin, an associate of Boykins and Millerson. During this clip, Boykins sees Jane Doe walking on a sidewalk along Linden Boulevard (1:04:05 p.m.) and is seen riding off on his bicycle to confront Jane Doe (1:04:12 p.m.). After an approximate 30 second interaction, Boykins is seen riding his bicycle back to Building #5 (1:04:52 p.m.) and entering Building #5 with Millerson to retrieve the firearm.

- Exhibit C-4: Boykins and Millerson enter the first floor hallway of Building #5 (1:04:56 p.m.). Approximately 15 seconds after entering Building #5, Boykins rides his bike out of the front door (1:05:12 p.m.) while Millerson remains inside retrieving the firearm.

- Exhibit C-5: Boykins rides out of the front door of Building #5 into the plaza and observes Jane Doe, who remained along the sidewalk on Linden Boulevard (1:05:20 p.m.). Boykins makes a loop and looks toward Jane Doe and then returns inside Building #5 (1:05:28 p.m.).

---

[1] Exhibit B, which was included as part of the government's initial submission, consists of trial testimony by a defense witness.

- Exhibit C-6: Boykins enters Building #5 on foot (1:05:33) and walks to the first floor hallway. Millerson and Boykins leave Building #5 approximately 15 seconds later (1:05:48 p.m.), with Boykins' right hand in his right sweatshirt pocket.

- Exhibit C-7: Boykins returns to his bicycle (1:05:53 p.m.) and begins riding toward Linden Boulevard. At the entrance to the path to Linden Boulevard, Boykins stops (1:06:00 p.m.) and returns to the front of Building #5 to huddle with Millerson (1:06:11 p.m.). After 14 seconds, Boykins leaves Millerson and begins riding to confront Jane Doe (1:06:25 p.m.). Boykins rides down the path with his right hand removed from the handle bars (1:06:29 p.m.). Approximately 17 second after leaving the screen, Boykins fires two shots (1:06:46 p.m.), birds are seen flying from nearby trees and Millerson back-peddles on screen. Seven seconds after firing the shots, Boykins is seen running from Linden Boulevard and entering Building #5 with Millerson.

- Exhibit C-8: Boykins and Millerson run away from the location of the shooting by going through the lobby of Building #5 (1:07:00 p.m.) and out of the back door.

- Exhibit C-8: Boykins and Millerson are seen running back to the entrance of Building #11 (1:017:20 p.m.).

- Exhibit C-10: Boykins and Millerson run into the lobby of Building #11 and through a door leading to a stairway (1:07:25 p.m.).

Additionally, a compilation of the relevant video footage (including descriptions of relevant location), which was not admitted at Boykins' trial, is included as Exhibit C-11.

II.   Argument

As outlined in the government's initial sentencing submission, in a felon-in-possession case, where the firearm was used in connection with another crime, § 2X1.1 is applied "in respect to that other offense." Id. § 2K2.1(c)(1)(A). The "substantive offense" most closely applicable to the actual offense conduct here is assault with intent to commit a murder or attempted murder. See id. § 2A2.1.[2] The evidence from Boykins' trial clearly

---

[2] Guideline Chapter 2A concerns "offenses against the person." Jane Doe did not die as a result of the shooting, so U.S.S.G. chapter 2A1, which concerns "Homicide" does not apply; §§ 2A1.1 (first-degree murder), 2A1.2 (second-degree murder), 2A1.3 (voluntary manslaughter), and 2A1.4 (involuntary manslaughter) are inapplicable. In addition to homicide, Chapter 2A also covers "assaults." There are three categories of assaults; § 2A2.1 covers "assault with intent to commit murder; attempted murder;" 2A2.2 covers aggravated assault"; and 2A2.3 covers "assault." Under § 2A2.1, there are two base offense levels for attempted murder. If the conduct was an attempted first-degree murder, the base-offense level is 33. If the conduct was less than first-degree murder, the base offense level is 27. The application notes for § 2A2.1 clarify that the Guideline applies to

3

established the requisite intent to kill necessary to support a finding of attempted second-degree murder.

    A.    <u>Applicable Law</u>

An attempted murder requires proof of "a substantial step towards" a murder and "the requisite mens rea." <u>Braxton v. United States</u>, 500 U.S. 344, 349 (1991) (citations omitted). "[A]lthough a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." <u>Id.</u> at 351 n.* (citing 4 C. Torcia, Whartons Criminal Law § 743, p. 572 (14th ed. 1981); R. Perkins & R. Boyce, Criminal Law 637 (3d ed. 1982); W. LaFave & A. Scott, Criminal Law 428–429 (1972)).

Under New York law, a person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person, he caused the death of such person or of a third person." N.Y.P.L. § 125.25(1). "The crime of attempted second degree murder is committed when, with the intent to cause the death of another person, one engages in conduct which tends to effect commission of that crime. Where those elements converge, an attempted murder has occurred, regardless of whether the defendant has killed or even injured his or her intended target. In other words, the crime of attempted murder does not require actual physical injury to a victim at all." <u>People v. Fernandez</u>, 88 N.Y.2d 777, 783 (N.Y. 1996). The <u>mens</u> <u>rea</u> element requires an assailant to "act[] intentionally in shooting a person to death—that is, with the conscious objective of bringing about that result." <u>People v. Gallagher</u>, 69 N.Y.2d 525, 529 (N.Y. 1987). "The intent to kill may be inferred from surrounding circumstances and a defendant's actions." <u>People v. Croley</u>, 163 A.D. 3d 1056, 1056 (3d Dep't 2018) (citation and internal quotation marks omitted).

With respect to evidence of intent, New York courts have cited factors supporting intent to kill to include: (1) a close distance between the assailant and the victim, <u>People v. Mathews</u>, 134 A.D. 3d 1248, 1249 (3d Dep't 2015) (holding that a jury may infer intent to kill from defendant firing gun at victim's chest from short range.); (2) whether there was pre-existing animus between victim and assailant, <u>People v. King</u>, 124 A.D.3d 1064, 1065 (3d Dep't 2015); (3) multiple rounds being discharged in the aftermath of an altercation, <u>People v. Culpepper</u>, 118 A.D.2d 866 (2d Dep't 1986); and (4)

---

"assault with intent to commit murder and attempted murder" and that "an attempted manslaughter or assault with intent to commit manslaughter" is covered by § 2A2.2. Under § 2A2.2 (aggravated assault), the base offense level if 14 and subject to various enhancements for specific offense characteristics. The application note for § 2A2.2 indicates that the "guideline covers felonious assaults that are more serious than other assaults because of the presence of an aggravating factor." The guideline's language and notes thus make plain that the distinguishing factor between § 2A2.1 and § 2A2.2 is the assailant's intent.

4

premeditation or planning, People v. Siler, 288 A.D.2d 625, 627 (3d Dep't 2001) (defendant purchasing gun on the same day as incident, loading the gun, and crossing the street to confront victim while in possession of weapon can be "presumptive evidence of intent to use it unlawfully against another" and with intent to kill). New York courts have further articulated that the location of gunshot wounds is not dispositive in construing intent, as defendant may have had the intent to kill but nevertheless misaimed. People v. Blue, 55 A.D.3d 391, 391 (1st Dep't 2008).

In United States v. Stroman, No. 09 CR 339 (ILG), 2011 WL 2444851, at *4 (E.D.N.Y. June 15, 2011), aff'd but criticized, 498 F. App'x 67 (2d Cir. 2012) (unpublished), Judge Glasser applied the attempted murder guideline, following a felon-in-possession trial conviction, where the defendant chased two men in a grocery store and fired his gun at them but missed. In Stroman, Judge Glasser relied on video surveillance footage to make the requisite finding on specific intent, and cited to N.Y. Penal Law § 125.25. 2011 WL 2444851, at *4.

The attempted murder guideline has been applied in other felon-in-possession trial convictions stemming from shootings. In United States v. Smith, 101 F.3d 202, 218 & n.17 (1st Cir. 1996), the First Circuit held that where the defendant fired a bullet into the ground, aimed at and shot the victim, and then chased the victim down the street while continuing to fire at the victim, the argument that he did not have "the intent to kill" his victim "merit[ed] little discussion." In United States v. Mun, 41 F.3d 409, 410–12 (9th Cir. 1994), the Ninth Circuit denied a sentence reduction to a defendant who was sentenced under the attempted murder guideline after an altercation with the victim where the defendant yelled, "I show you [sic], motherfucker," fired two shots in the air and then fired three more shots in the bar in which the victim was present. The Ninth Circuit referenced its earlier holding that such evidence "was sufficient to conclude that [the defendant] intended to kill." Furthermore, under New York law—for an attempted intentional murder charge—no actual physical injury is required to a victim at all, nor is evidence that the injuries suffered by the victim placed them at an actual risk of death. See Hernandez, 88 N.Y.2d at 783; People v. Holmes, 129 A.D.3d 1692, 1694 (4th Dep't 2015). Evidence showing that the defendant chased the victim can show intent to kill for attempted murder conviction, regardless of the severity of injury actually suffered by the victim. Id.

B. Discussion

The evidence of Boykins' intent is clear from the testimony of Jane Doe and the indisputable video evidence that showed planning, the introduction of a dangerous weapon, and clear aggression by Boykins. Had Jane Doe not survived, this evidence could unquestionably support a finding of second-degree murder.

First, the trial evidence showed that Boykins initiated the confrontation with Jane Doe. Jane Doe testified that prior to the shooting, she and two female friends were

5

walking east along Linden Boulevard in East New York to a nearby pet store to buy food for new puppies. As shown on Exhibit C-3, Boykins and his associates were lingering in the plaza in front of Building #5 when Boykins saw Jane Doe walking along the sidewalk. With no words exchanged, Boykins rode to confront Jane Doe (1:04:12 p.m.). From Jane Doe's testimony, Boykins told Jane Doe not to walk in "his" area of the Pink Houses. See Exhibit A: Transcript dated June 11, 2019 ("Tr."), at 75:15-18. When Jane Doe began arguing back, Boykins escalated the confrontation by going inside a nearby building to retrieve the firearm. Id. at 75:15-21.

Second, Boykins unquestionably escalated a non-violent argument into a near-fatal shooting. Boykins was the person who left the argument and retrieved a deadly weapon. There is also no dispute he did so to confront an unarmed person. There was a motive established from the ongoing argument, and with Boykins introducing a deadly weapon against an unarmed and defenseless victim, the Court can conclude the combination of motive and the firearm establishes an intent to kill. See, e.g., People v. Whitfield, 634 N.Y.S.2d 315, 315 (1995) (4th Dep't. 1995) (upholding second-degree murder conviction where "the defendant did not see the victim with a weapon that evening, and [] the victim was unarmed"). This was not a situation where Boykins feared for his life or procured a gun in fear of armed retaliation during the confrontation. Neither is this a situation where Boykins possessed a gun during a random confrontation and fired while under the influence of an extreme emotional disturbance.

Third, the evidence of confrontation and escalation was in the context of clear, existing animus between Boykins and Jane Doe. People v. King, 124 A.D.3d 1064, 1065 (3d Dep't 2015). In addition to the motive for killing created by the argument, the evidence of prior attempts to shoot at Jane Doe and her husband establishes an intent to specifically harm Jane Doe. Jane Doe testified that she had always sensed that the defendant was hostile towards her. (Tr. 59:2-14). Jane Doe testified about a series of incidents between her and members of the defendant's gang that took place in mid-2017. In one instance, members of the gang had interrupted a water fight and sought to create trouble by starting a physical fight, (Tr. 61:18-24); in another, members of the gang apparently fired shots at Jane Doe's husband, (Tr. 66:3-18); and in a third incident, Jane Doe confronted a member of the gang, accusing him of shooting at her and her husband, (Tr. 67:6-14). As New York state courts recognize, a rational jury could infer from "longstanding dislike" and repeated threats that a defendant had the requisite intent to kill for intentional murder under New York law. See King, 124 A.D.3d at 1065.

Next, there was overwhelming evidence of planning and premeditation. See, e.g., United States v. Mulder, 273 F.3d 91, 117 (2d Cir. 2001) (holding the "length of time of premeditation is not material") (internal quotation marks omitted). The video surveillance evidence establishes the planning for the shooting taken by Boykins. There was an approximate 90 second break between Boykins first angrily riding away from Jane Doe and returning with the firearm to shoot her. After Boykins left Jane Doe, both he and Millerson went inside of a building to retrieve the firearm. Boykins then broke off from Millerson,

6

returned back outside without a firearm to check that Jane Doe was still present, and then went back inside Building #5 (Exhibit C-5). When Boykins walked back outside from Building #5, he apparently had the firearm in his right, sweatshirt pocket. After beginning to ride his bicycle back to Jane Doe, Boykins paused and returned to the building's entrance to huddle with Millerson—more evidence of planning. After 14 seconds, Boykins left Millerson and began riding to confront Jane Doe. The evidence showed the firearm was outside of Boykins pocket as he rode—a clear indication he intended to use the weapon. The calm manner in which Boykins proceeded prior to the shooting supports an inference of intent to kill.

The case of People v. Hamilton, 127 A.D.3d 1243 (3d Dep't 2015) is instructive on the importance of both planning and previous animosity between the defendant and victim. There, the court applied a transferred intent theory to affirm the defendant's conviction for second-degree murder. The intent to kill was based on a previous quarrel that defendant had with an individual earlier in the day. The defendant left the scene, received a gun from an associate, and fired at his target, accidentally shooting a bystander instead. The court held the evidence in the case—a history of animosity coupled with an intentional plan to procure a gun, return to the scene of the confrontation, and fire at the target—was legally sufficient to affirm a conviction of intentional murder in the second degree. Id. at 1245. As in Hamilton, Boykins quarreled with Jane Doe, left to retrieve a gun, and returned to the scene before shooting at her.

Finally, the shooting happened at point-blank range and involved multiple discharges of a firearm. See, e.g., Culpepper, 118 A.D.2d at 866 ("Such intent could be inferred from the defendant's repeated firing of a gun in Green's direction shortly after an altercation the defendant had with Green and others, and immediately after the defendant twice shot and seriously injured Marjorie McDonald."). Jane Doe testified that Boykins rode right to her with the firearm in his right hand. Boykins was so close that Jane Doe was able to punch Boykins to try to stop him. Jane Doe testified that Boykins jumped up quickly and fired two shots. If Boykins was shooting with intent to harm, rather than to kill, there is no explanation for firing two shots. Boykins was aware that Jane Doe was unarmed and had no reason to fear armed retaliation.

For these reasons and those provided in the PSR, the government continues to urge the Court to apply the U.S.S.G. § 2A2.1(b) as the starting point for the defendant's Guidelines calculation. Alternatively, if the Court concludes that the foregoing evidence concerning Boykins' intent does not meet the preponderance standard establishing attempted murder, the government submits that U.S.S.G. § 2A2.2(a) ("aggravated assault") would apply. As the application notes for that guideline state, it applies when a felonious assault is accompanied by one or more aggravating factors, such as the use of a dangerous weapon. The base offense level for aggravated assault is 14, id. § 2A2.2(a); there is a five-level enhancement for a firearm being discharged, id. § 2A2.2(b)(2); and a five-level enhancement for serious bodily injury (PSR ¶ 14), id. § 2A2.2(b)(3)(B). The offense level of 24 is reduced

by six for the defendant being an accessory-after-the-fact, § 2X3.1(a), and, with acceptance of responsibility, the final offense level would be 15. At criminal history category IV, the defendant's sentencing range for aggravated assault would be 30-37 months.

III.     Conclusion

For the foregoing reasons and those set forth in the government's initial sentencing memorandum, the government respectfully requests that the Court impose a sentence of imprisonment within the Guidelines range of 51 to 63 months.

Respectfully submitted,

RICHARD P. DONOGHUE  
United States Attorney

By:     /s/ James P. McDonald
        James P. McDonald
        Assistant U.S. Attorney
        (718) 254-6376

*Enclosures*

cc:     Clerk of Court (BMC) (by ECF) (no enclosures)
        Florian Miedel, Esq. (by ECF and Fed-Ex)
        Probation Officer Shayna Bryant (by E-mail and Hand)

# **EXHIBITS C-1 TO C-11**

Enclosed on CD (not filed on ECF)